Robinson & Caldwell v. Mauldin, Montague & Co.

---

## ROBINSON & CALDWELL v. MAULDIN, MONTAGUE & Co.

1. A growing crop of cotton may be conveyed by deed of trust.
2. A conveyance of " fifty thousand pounds of cotton, to be produced during the present year, upon the plantation of the party of the first part, in the county of Marengo, the said cotton to be the first cotton which may be gathered from the crop of cotton now planted and growing upon the said plantation, and to be neatly ginned and packed in good bales, ready for market," is a conveyance of 50,000 lbs. of ginned, or cleaned cotton. The terms " first cotton which may be gathered," means of the early, in contradistinction to the late gathering ; and therefore when ninety-one bales of the early gathering were ginned and baled, the *lien* attached, although there was then in its crude state, a quantity of cotton not separated from the seed, gathered earlier in the season, than that which composed the ninety-one bales.

123

3. When one professing to act as an attorney in making a deed, acknowledges that he signed it, &c. for the purpose of registration, his acknowledgement will be referred to the character in which he is acting.

4. When a trustee in a deed of trust, refuses to make the affidavit, and take the steps necessary to a trial of the right of property, the *cestui que trus* may resort to a court of chancery to have the trust enforced.

5. An authority to execute a deed of trust, gives the power by implication to acknowledge it for registration.

6. The omission to state in the probate of a deed, made by an attorney in fact, that it was *delivered*, is not essential, it having been in fact delivered by him and registered.

Error to the Chancery Court of Marengo.

THE bill was filed by the defendants in error, and alledges that Josiah Du Bose, of South Carolina, engaged in the business of plainting, in Marengo county, was indebted to them in the sum of $3,366 22, due on the 1st January, 1843, by promissory note, indorsed by one James H. Du Bose, and dated the 26th April, 1842 ; that on the day of the date of the note, Isaiah Du Bose, by James H. Du Bose, his attorney in fact, to secure the payment thereof, executed a deed of trust to John J. Lomax as trustee, by which he conveyed fifty thousand pounds, of the first picking of the crop of 1842, then growing on his plantation, to be neatly ginned, and packed, in bales ready for market, and upon the failure of said Du Bose to pay the note at maturity, the trustee was authorized to take said 50,000 pounds of cotton, and ship the same to complainants at Mobile, to be there sold for the payment of the note, unless the said Du Bose should pay the same, or ship his cotton to them for the same purpose.

That Du Bose had gathered, and ginned 50,000 lbs. of the cotton of the first picking, of 1842, and had packed the same, in about 112 bales, of which 91 bales, or thereabout, of the identical cotton conveyed in trust, were remaining on the plantation for the purpose of being shipped to them at Mobile, and sold to satisfy the trust, when they were seized and taken by the sheriff of Marengo, upon a writ of execution in favor of Chas. Maywood, against Isaiah Du Bose, for a large sum of money,

Robinson & Caldwell v. Mauldin, Montague & Co.

which was issued subsequent to the making, and recording of the trust deed.

That the 50,000 lbs. of cotton, is insufficient to discharge the note ; that Isaiah Du Bose is insolvent, and James H. Du Bose merely an accommodation indorser ; yet the sheriff knowing these facts, and combining with Robinson and Caldwell, who are partners of Charles Maywood, persist in threatening to sell said cotton, &c. That Lomax, the trustee appointed in said deed, refuses to become a party to a suit at law for the trial of the right to said cotton, or to interfere effectually in any other manner at law, as such trustee, to secure the benefit intended to be secured by the conveyance.

Prayer for an injunction, &c.

The power of attorney proved, and recorded, and the deed of trust also recorded, are made exhibits to the bill. The probate of the latter, indorsed on the deed, is as follows :

*State of Alabama—Marengo county.*

Personally appeared before me, Thomas J. Woolf, clerk of the county court of said county, James H. Du Bose, attorney in fact for Isaiah Du Bose, and acknowledged that he signed, sealed, and, the foregoing deed on the day of the date thereof, to the therein named John S. Lomax, and the said John S. Lomax, and R. V. Montague, at the same time acknowledged before me, that they signed and sealed the same, at the same time, for the purposes therein expressed. Signed and attested by the clerk, the 26th April, 1842.

The defendants, by their answer, admit the levy, &c. Deny all knowledge of the consideration of the note, to secure which the deed was made, or of the deed, and require proof—that the deed was made to defeat their claim, founded on a judgment obtained in South Carolina, upon which suit was then pending. Insist that the deed of trust did not convey the cotton, but was a mere agreement for a sale of the cotton when gathered, &c.

Upon application, an order was made for the examination of Lomax, and W. H. Du Bose, as witnesses.

Much testimony was taken, fer which, so far as it is important, see the opinion of the court.

The cause coming on to be heard, the chancellor overruled the objections to the testimony of the witnesses, Gaudy and Lomax, and considering that the deed contained a transfer of the cotton, and was not a mere agreement for a sale in future, decreed in favor of the complainants.

These matters are now assigned as error.

BROOKS, for plaintiff in error.
MANNING, contra.

ORMOND, J.—The principal question in the cause, whether a growing crop of cotton, can be the subject of such a conveyance as this, appears to be fully established in the cases of Ravisies v. Alston, 5 Ala. 297, and Adams v. Turner & Horton, Ib. 470, where it is explicitly declared, that a growing crop has such an existence, as may be the subject matter of a sale, mortgage, or other contract, to vest in possession, either immediately or at some future time. This doctrine is well supported, both by reason and authority.

In Curtis v. Auber, 1 Jac. & W. 510, an assignment of the present, and future earnings of a ship was sustained by Lord Eldon. So an assignment of freight earned, or to be earned by four ships, was held to be good by the vice chancellor, in Douglass v. Russell, 4 Sim. 524, and affirmed on appeal to the Lord Chancellor. In the recent case of Langton v. Horton, 1 Hare, 549, which was a deed of assignment by way of mortgage, of a whale ship, her tackle, &c.; and all oil, and head matter, and other cargo, which might be caught, and brought home in the ship, on, and from her then present voyage. In this, as in most of the preceding cases, the question arose, as in this case, between an execution creditor of the assignor, and the assignee, as to the future cargo, or earnings of the vessel, after the assignment, and the vice chancellor held, the conveyance to be good. He said, "it was impossible to doubt, for some purposes at least, that by a contract, an interest in a thing not in existence at the time of the contract, may, in equity, become the property of a purchaser for value."

In Mitchell v. Winslow, 6 Law Rep. 8 No. 350, Judge Story reviewed all the leading decisions upon this subject,

Robinson & Caldwell v. Mauldin, Montague & Co.

and held, that a mortgage upon machinery, tools, and stock in trade, was valid, and protected the mortgage in a court of equity, against the assignee of the mortgagor in bankruptcy, although in conformity with the stipulations of the deed, a portion of the machinery, tools, &c. was put into the factory after the execution of the mortgage.

Chancellor Kent in his commentaries, 3 vol. 5 ed. 488, note, speaking upon this subject, says, " It is sufficient, that the thing contracted for has a potential existence, and a single hope, or expectation of means, founded on a right in *esse*, may be the object of a sale—as the next cast of a fisherman's net, or fruit, or animals not yet in existence."

The facts of this case bring it within the limits of most of those cited. It was not the sale of an article to be obtained, or produced in future, as the product of something then in existence, but it was the sale of the crop then growing. It had an actual, and not a mere potential existence, and by the operation of the laws of nature, would certainly be perfect in the course of the season. It is considered by Lord Eldon, in the case of Curtis v. Auber, *supra*, a settled principle, that wool growing on the backs of sheep may be assigned, and that even an assignment of the future fleeces would be good in equity ; and certainly there can be no rational distinction between wool growing on the backs of sheep, and cotton maturing in the field. See also, Robinson v. Macdonnel, 5 M. & S. 228.

It is also urged, that this conveyance is void for uncertainty—that although the conveyance of an entire growing crop might be supported, this cannot, because it attempts to convey an unknown, unascertained, and uncertain portion of it. The conveyance is of " fifty thousand pounds of cotton, to be produced during the present year, upon the plantation of the party of the first part, in the county of Marengo, the said cotton to be the first cotton which may be gathered from the crop of cotton now planted, and growing upon the said plantation, and to be neatly ginned, and packed in good bales, ready for market."

If the conveyance of the entire growing crop would be supported, we are unable to perceive why an ascertained quantity and portion of the crop, would not fall within the same

rule. The first fifty thousand pounds which shall be picked out, ginned and baled, is as certain, and conveys to the mind as distinct and precise an idea of the thing conveyed, as if it had been the entire crop. The cases referred to, of sales· of property where something remained to be done by the vendor, before the article was to be delivered, or where the thing sold was part of a large mass, which was to be separated from it, and before which it was impossible to know what particular portion belonged to the vendee, have no application here, because the portion conveyed was in fact separated from the general mass before the levy of the execution ; and if not previously, certainly when the fifty thousand pounds of cotton were picked, ginned and baled, that was such a separation from the general mass as would vest the property in the vendee, within the principle of the cases of Harrison v. Meyer, 6 East, 614 ; Austin v. Craven, 4 Taunton, 644, and White v. Wilks, 5 Id. 176.

We shall briefly consider the other questions, in the order in which they are made. It is true, that where an execution is levied on property secured by a mortgage or deed of trust, as a complete remedy exists at law, by the trial of the right of property, a resort cannot be had to a court of equity. But in this case, it is expressly alledged that the trustee refuses to take the necessary steps to have a trial of the right, and this allegation not being controverted, or put in issue by the answer, must be considered as admitted. This takes the case out of the rule laid down in Marriott & Hardisty v. Givens, 8 Ala. 706. The *cestui que trust* has no means of compelling the trustee to make the affidavit, and execute the bond which the statute requires as preliminary to a trial of the right of property, and if he refuses to do so, the beneficiary may resort to a court of chancery for protection.

The objection cannot be made in this court, that there is no proof that Lane had parted with his interest to the complainants, as the fact was not denied or put in issue by the defendants. In Hubbard v. Moore, 4 Ala. 192, the plaintiff's title was directly controverted, and upon that ground, it was held to be necessary he should prove that his co-partners had transferred their interest to him. That was a case in which

one partner, assuming to represent several, sued the remaining co-partners for a settlement of the partnership accounts, his right to sue alone was therefore a question in which the defendants had a direct interest. Here the objection is purely formal, as the defendants have no interest whatever in the question, and as it does not appear that the objection was made in the court below, where doubtless the necessary proof would have been made, it cannot be raised here.

There was no error in refusing to suppress the deposition of Gaudy, because it did not answer fully the cross interrogatory, as the question which he omitted to answer was wholly immaterial, and if answered, could have had no influence upon the case.

The supposed ambiguity in the deed does not belong to that class which admits of explanation by parol proof; but in our opinion the alledged ambiguity does not exist. We consider the terms, "fifty thousand pounds of cotton," to mean that quantity of baled cotton. This is shown by the context, the object and purpose of the deed, and the debt it was intended to secure. Besides, conceding it to be susceptible of two meanings, that construction should be put upon it, most favorable to the grantee, especially where that construction accords with the professed object of the parties, the security of the debt, whilst the other would in a great measure defeat it.

The remaining questions, arise out of the registration of the deed, and the authority of the agent. The probate is alledged to be insufficient, because it omits the word "delivered." In Hobson v. Kissam & Co. 8 Ala. 360, the constituents of the probate of such a deed as this, were considered by us at length, and we there held that the omission in the certificate of probate to state that the deed was executed on the day of its date, did not prevent its registration under the act of 1828. That decision is fully in point in this case, for certainly the omission to state in the probate that the deed was delivered, could not be material, when the fact that it was registered upon the acknowledgment of the grantor, necessarily includes a delivery of the deed.

It is further urged, that the agent had no authority to make an acknowledgment of the execution of the deed, for

the purpose of registration. The power under which he acted, authorized him "to draw promissory notes, bills of exchange, and writings obligatory under seal, to enter into contracts for, and make sale of any kind of property, either real or personal, and to do and perform all manner of business, as to him should seem expedient" for the management of the affairs of his principal. We think it perfectly clear, he had the power expressly conferred on him, to execute such a deed as this, and that necessarily carries with it the authority to do every thing necessary to make the deed effectual. As he had the power to execute a deed of trust to secure a debt his principal owed, he had also the power to do all other acts essential to the execution of the power, though not expressly, and in terms conferred by the grant. Having power to execute the deed, he had also the power to acknowledge its execution, for the purpose of registration.

It also supposed that the deed was acknowledged by the attorney in his individual capacity, and not as agent, and that it is therefore insufficient. Its language is "personally appeared before me, &c. James H. Dubose, attorney in fact for Isaiah Dubose, and acknowledged, that he signed, sealed, &c. the foregoing deed on the day of the date thereof, to the therein named John T. Lomax," &c. The reasonable construction to be put upon this language is, that he acknowledged the deed on behalf of, and as the agent of his principal, as otherwise there is no motive for the recital of the fact, that he appears as the attorney of another person. But when the acknowledgment is considered in connection with the deed to which it refers, all doubt is removed, as it relates to a deed which was executed by him as the attorney in fact of Isaiah Dubose. No particular form of words is necessary to manifest the intent. It is sufficient if it can be gathered that the intention was to act as an attorney, and not in his individual capacity.

This disposes of the entire case, and ascertains that the chancellor did not err in the decree rendered; it is therefore affirmed.

The cause was re-argued on petition of the plaintiff in error.

Robinson & Caldwell v. Mauldin, Montague & Co.

Brooks, for plaintiff in error.
Manning, contra.

[Opinion of the court upon the re-argument.]

ORMOND, J.—We retain the opinion first expressed, that the terms "fifty thousand pounds of cotton," mean ginned cotton, and not cotton as it is gathered from the plant, and from which the seed has not been separated. No other construction can reasonably be put upon the language employed, whether it be considered in reference to the object the parties had in view, or the thing contracted for. In common parlance, when one speaks of cotton, unless the contrary is expressed, or necessarily to be inferred from the context, or subject matter, the pure commodity, separated from the seed, is understood. Thus, if one was speaking of the quantity of cotton a hand could pick or gather in a day, he would be understood to mean cotton from which the seed had not been separated. But if he was speaking of the price of cotton, or offering to sell cotton at a stipulated price, he would be understood to refer to pure cotton, from which the seed had been separated, unless the context showed he meant otherwise. This was in effect a sale, as it was in fact, an appropriation of so many pounds of cotton to the payment of a debt, and unless the contrary were expressed, or necessarily to be inferred from the context, the language must be understood in its natural and ordinary acceptation. The fact, that the plaintiffs in error were not parties to this contract, can make no difference in the rule of construction which must be applied to it. They claim under the maker of the deed, and are bound by all the inferences and presumptions which would affect him.

The other question is one of more difficulty. In the outset, a conveyance is made of "fifty thousand pounds of cotton, to be produced during the present year, on the plantation of the party of the first part." If it had stopped here, it would clearly have been a *lien* created on the entire crop, but the deed proceeds to state, "said cotton to be the first cotton which may be gathered from the crop of cotton now planted and growing," upon the said plantation, and to be

124

neatly ginned and packed in good bales ready for market."
Now, when was it the intention of the parties, the cotton
should vest in the trustees? Did it vest in him as each lock
of cotton was separated from the stalk on which it grew, or
when it was collected in baskets for the purpose of being re-
moved from the field; or when accumulated in larger masses
in the cotton house? According to the argument urged, that
the conveyance was of the first fifty thousand pounds gath-
ered, and that when that quantity was gathered, it was sepa-
rated from the general mass, and vested in the trustee, it
would necessarily follow, that as each boll of cotton was
gathered from the plant, (as the whole must be composed of
the separate parts,) it became a part of the entire amount
conveyed, and as such vested in the trustee.

We have already seen, that the conveyance was not seed
cotton, but of fifty thousand pounds of pure, or ginned cot-
ton, and until the cotton was separated from the seed, it was
not the thing conveyed, something remaining to be done, by
which to ascertain the quantity to which the trustee was en-
titled. Until this was done by ginning and baling it, the
property in question did not pass to the trustee, though
doubtless he had a *lien* upon the article in its crude state;
and this inchoate right, a court of chancery would have pro-
tected, if an attempt had been made to divert the cotton from
its proper destination. By the agreement of the parties, the
cotton was to be ginned and picked, ready for market, and
until this was done, the article was not placed in that condi-
tion in which it was to be placed, when the title of the
trustee was to be complete; or, to speak with more precis-
ion, when the *lien* became perfect. As it was to be the first
cotton gathered, which was to be ginned and baled for the
security of the debt, upon a plantation of the size this is ad-
mitted to have been, this would happen early in the season,
as in fact it did occur, early in November, if not sooner. But
the debtor had until the first of January to pay the debt, and
as until then there could be no default, the trustee had a *lien*
merely, upon the cotton as ginned and baled, until that period
arrived.

The contract must be interpreted by reference to the nature of the thing sold, in connection with the custom of the planter in ginning and securing his crop for market. It must have been known, that in the economy of the plantation, the processes of gathering, ginning, and baling the crop, were carried on together; the first two simultaneously, and the last at short intervals, as the clean cotton accumulated in the pick room. The parties then, could not have meant literally, that the first fifty thousand pounds gathered, should be the first ginned and baled, as the gathering and ginning would proceed together, and it would therefore be impossible to prevent the confusion of goods, which it is insisted has here taken place, by the intermixture of the cotton of the debtor with that designed for the payment of this debt. The terms, "first gathered," must be understood relatively, and not absolutely. It meant doubtless, that the cotton should be of the best quality, which would be that gathered early in the season, which is indicated by the language employed, and was merely intended to exclude the cotton last gathered, the importance of which will be seen, when we reflect, that the picking season would probably be over before there could be a default under the deed. It appears then to us, that the ninety-one bales here in dispute, being the first ginned and baled, sufficiently answer the description in the deed of the cotton conveyed, although there was then, in its crude state, a quantity of cotton gathered earlier than any included in these bales. It was notwithstanding cotton *of the first, or early picking*, which was doubtless the precise meaning of the parties. The arguments so strenuously urged, founded upon the supposed analogy between this case, and a conveyance of specific property, having an individual, separate existence, are not in point. The example put, of the first born of certain designated female slaves, would be a clear case, where the parties had individualized the property, intended to be conveyed, and when the children came into existence, the *lien* would attach, and could operate on no others.

But in addition, we think it does appear with reasonable certainty, that the ninety-one bales, with the exception of the unginned cotton, gathered previous to them, were of the

first gathering of the cotton. The overseer in his testimony says, that at the time of the levy, there were about fifty thousand pounds of cotton gathered, which had not been ginned, of which thirty-five or thirty-six thousand pounds were of the first hundred thousand pounds that were gathered. It is very certain then, that all the cotton gathered, had been ginned and baled, except the amount here stated, and that gathered previous, would make about twenty bales; and as he states that the first ninety-one bales ginned, are those claimed by the trustee, these, if added to the twenty bales not ginned, will only make about the quantity of cotton conveyed by the deed. So that in truth, the party is claiming the cotton which was first gathered, as well as first ginned and baled.

The obscurity in the testimony arises from the expression, that of the hundred thousand pounds first gathered, thirty-five or thirty-six thousand pounds remained yet to be ginned. But it is also clear, that the remainder of this hundred thousand pounds had been ginned and baled, so that the two parcels must have constituted all the cotton gathered at the time of the levy. The result of the examination is, that the judgment heretofore pronounced is correct.